IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| OTIS PHILLIPS, | § | |
| | § | No. 497, 2015 and |
| Defendant Below, | § | No. 500, 2015 |
| Appellant, | § | |
| | § | Court Below—Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | Cr. ID No. 1210013321 |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: December 7, 2016
Decided: January 17, 2017

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED** and **REMANDED FOR RESENTENCING**.

Anthony A. Figliola, Jr., Esquire (*Argued*), Michael C. Heydon, Esquire, Greto Law, Wilmington, Delaware, Attorneys for Defendant Below, Appellant.

Andrew J. Vella, Esquire (*Argued*), Sean P. Lugg, Esquire, Department of Justice, Wilmington, Delaware.

**HOLLAND**, Justice:

A 54 count indictment charged Otis Phillips ("Otis") and numerous co-defendants with Gang Participation and charges associated with the activities of the Sure Shots criminal street gang. The indictment charged Otis with three counts of Murder in the First Degree, Attempted Murder in the First Degree, Assault First Degree, Gang Participation, Conspiracy First Degree, Reckless Endangering in the First Degree, six counts of Possession of a Firearm During the Commission of a Felony ("PFDCF"), Conspiracy Second Degree, and Possession of a Deadly Weapon by a Person Prohibited ("PDWBPP").

The Superior Court denied severance motions and conducted a joint capital trial of co-defendants Otis and Jeffrey Phillips ("Jeffrey"). The jury found Otis guilty of Murder in the First Degree, Murder in the Second Degree (as a lesser-included offense of Murder in the First Degree), Manslaughter (as a lesser-included offense of Murder in the First Degree), Gang Participation, Conspiracy in the First Degree, five counts of Possession of a Firearm During the Commission of a Felony, Assault Third Degree (as a lesser-included offense of Assault in the First Degree), Assault Second Degree, and Reckless Endangering. The jury acquitted him of one count of PFDCF and Conspiracy Second Degree.

The Superior Court conducted a four-day penalty hearing. The jury found, unanimously and beyond a reasonable doubt, two statutory aggravating circumstances: that Otis's "course of conduct resulted in the deaths of two or more

2

persons where their deaths [were] the probable consequence of [Otis's] conduct"; and that the "murder was premeditated and a result of substantial planning." The jury weighed the aggravating and mitigating circumstances presented and unanimously found by a preponderance of the evidence that the aggravating circumstances outweighed the mitigating circumstances. The Superior Court sentenced Otis to death for Murder in the First Degree, life imprisonment for Murder in the Second Degree, and 130 years of incarceration for the remaining offenses.

Otis raises several issues on appeal. First, he contends that the Superior Court abused its discretion when it denied his motions to sever his trial and some of the charges. Second, he argues that the Superior Court erred by admitting co-conspirator statements, certified records of conviction of non-testifying co-defendants, and the statement of an unavailable witness. Third, Otis submits that the Superior Court abused its discretion by denying his motion for a mistrial following Clayon Green's comment that, "[i]f you think I'm lying, ask Otis and what's his name if I'm lying." Fourth, Otis argues that the Superior Court improperly responded to jury notes. Fifth, Otis contends that his right to a speedy trial was violated.

Finally, Otis argues that his death sentence is unconstitutional based upon the United States Supreme Court's decision in *Hurst v. Florida*.[1] In *Rauf v. State*,[2] this

---

[1] 136 S.Ct. 616 (2016).
[2] 145 A.3d 430 (Del. 2016).

Court held that Delaware's death penalty statute was unconstitutional because it violated the Sixth Amendment role of the jury as set forth in *Hurst*. In *Powell v. State*,[3] this Court held that our decision in *Rauf* applied retroactively.[4] Accordingly, the State acknowledges that Otis's death sentence must be vacated and asks that this case be remanded to the Superior Court with directions that Otis be resentenced on the charge of Murder in the First Degree.

We agree that Otis's death sentence must be vacated and that he must be resentenced on the conviction of Murder in the First Degree to "imprisonment for the remainder of his natural life without benefit of probation or parole or any other reduction."[5] We have concluded that none of Otis's other arguments are meritorious. Therefore, the judgment of convictions by the Superior Court must be affirmed.

### *Facts*

On January 27, 2008, Christopher Palmer was shot and killed inside an after-hours nightclub in Wilmington, Delaware. Herman Curry witnessed the murder. More than four years later, on July 8, 2012, Curry and Alexander Kamara were shot and killed during a soccer tournament at Eden Park in Wilmington, Delaware. Wilmington Police Department ("WPD") officers investigated the 2008 and 2012

---

[3] *Powell v. State*, ____ A.3d _____ (Del. 2016).
[4] *Id.*
[5] 11 *Del. C.* § 4209(d)(2).

murders. The investigations revealed that the suspects in the homicides, Otis and Jeffrey, were members of a criminal gang known as the "Sure Shots."

***Christopher Palmer Murder.*** There was a birthday party for Curry on January 27, 2008 at a nightclub on Locust Street in Wilmington. Palmer, the security guard responsible for checking guests for weapons prior to entry, denied three individuals—believed to be Otis, Jovani Luna, and Dwayne Kelly—entry into the club because "one or more of them was armed." A bystander, Clayon Green, witnessed the trio of men return and saw one of them push Palmer after he was again denied entry. According to Green, "Palmer and his assailant fell into a nearby bathroom, Otis 'reached around' into the bathroom and Green heard three shots." Palmer died as a result of the gunshot wounds. Curry also witnessed the incident and identified Otis as Palmer's shooter in a photo lineup. Afterwards, Kelly told Paula Thompson—his girlfriend at the time—that he and Otis were going to New York and Kelly did not see Otis after that visit.

***Nightclub Incident.*** Four years later, on July 7, 2012, Jeffrey was involved in a shooting at The River nightclub. According to the State, Kelmar Allen's testimony established that Allen removed Jeffrey from the club after Jeffrey got into an altercation with a rival gang member. As Allen and Kirt Williams waited for an elevator, Christopher Spence shot at them, "killing Williams and wounding Allen." After running outside, Allen "saw Jeffrey firing a .40 caliber gun at a person named

5

'Mighty,'" a rival gang member. The next day, Allen saw Jeffrey at a house on Lamotte Street, where he and other Sure Shots members were "collecting guns and bullets in the basement of the home." According to Allen, the members were angry because they wanted to find the rival gang members from the night before. The Sure Shots leader, Seon Phillips ("Seon", Otis's brother, no relation to Jeffrey), loaded a .40 caliber gun and gave it to Jeffrey.

*Eden Park Murder.* On July 8, 2012, Curry organized an annual soccer tournament at Eden Park in Wilmington, Delaware. While Ricardo Brown was preparing food at the outdoor kitchen with Curry, he noticed two men walk through a gate onto the soccer field. Shortly after that, he heard "fire rockets go off" and "turned and saw one of the men shoot Curry while the other shot his gun 'wild[ly].'" Curry and Kamara died as a result of their gunshot wounds (the "Eden Park Homicides").

There were other witnesses to the homicides. Nearby soccer player, Raoul Lacaille saw two men approach Curry, tap him on the shoulder, and shoot him, identifying Otis as Curry's shooter. Omar Bromfield also heard what he described as firecrackers, saw a crowd running through the parking lot, and discovered shortly after that he had been shot. Venus Cherry, a tournament participant, saw two men enter the field, approach Curry, tap him on the shoulder, and one said, "Ninja, run, pussy, today you are dead," prior to shooting him. According to Cherry, "[t]he

6

second man turned toward the 'kitchen' area and fired his gun; a bullet hit Kamara and Cherry." Cherry identified Otis as Curry's shooter and Jeffrey as Kamara's shooter.

Green witnessed Otis and Jeffrey walk across the field and then "saw Otis shoot at Curry, and Jeffrey shoot toward the parking lot as if to clear the way." Green then saw Otis and Jeffrey return to a gold car, and saw Christopher Spence approach the car and shoot the driver, Serge. Minutes after the shooting, officers found the gold car crashed at a nearby intersection. Officer Corey Staats found a handgun on the rear seat, "and observed the semi-conscious driver bleeding from his torso." Upon searching the vehicle, police discovered a 9 mm handgun, .40 caliber handgun, and black baseball cap containing DNA that matched that of Otis. According to firearm examiner Carol Rone, the shell casings collected from the Eden Park crime scene were fired from the recovered firearms.

Officers searched the surrounding area for the two men who had fled from the crashed gold car and located Otis and Jeffrey in a back yard approximately four blocks north of Eden Park. A brief standoff followed, and then the officers arrested Otis and Jeffrey. The police noticed Jeffrey was wounded from a gunshot in the leg and discovered 20 rounds of 9 mm ammunition in his pants pocket.

The State's primary witness against Otis and Jeffrey was Allen. Prior to trial, Allen pled guilty to Gang Participation. The sentence imposed by the trial judge

7

was a period of incarceration suspended for time served (119 days) followed by level III probation.

*Gang Participation.* Otis and Jeffrey actively participated in the Sure Shots gang. In addition to the murders of Palmer, Curry, and Kamara, they participated in other gang-related activity. Maria Dubois testified that she had been a member of the gang since 2003. She sold drugs for the gang and had daily contact with other gang members, including Otis. Dubois was present at The River nightclub when Palmer was killed. She testified that Otis was present that evening and, while she did not see him with a firearm at that time, he carried a firearm "as often as he needed." Dubois did not remember seeing Otis after the Palmer murder.

Michael Young joined the Sure Shots gang in 2003. He sold drugs for the gang on 7th Street in Wilmington. According to Young, Otis was also a member of the gang and would always fire a gun in the air after being at a club that closed down for the evening. On May 5, 2007, Young, Otis, Dwayne Kelly and other members of the Sure Shots gang were at the nightclub at 8th and Adams Street. When the group left the nightclub, Young approached Harris and lifted his shirt, thinking that Harris was armed. Harris pushed Young's arm away, and Otis immediately punched him. Kelly then hit Harris in the head with a handgun, stepped back, and shot him one time. Otis and Kelly fled to a nearby home where Kelly's girlfriend lived.

8

As a result of the Palmer, Curry, and Kamara murders, the assault and shooting of Antoine Harris, the illegal possession and use of firearms, and the illegal possession and distribution of controlled substances, Otis was charged with three counts of Murder in the First Degree, Attempted Murder in the First Degree, Assault First Degree, Gang Participation, Conspiracy First Degree, Reckless Endangering in the First Degree, six counts of Possession of a Firearm During the Commission of a Felony, Conspiracy Second Degree, and PDWBPP. The Superior Court conducted a joint trial of Otis and Jeffrey.

### *Joinder of Defendants Proper*

Ordinarily, defendants indicted together should be tried together, but, if justice requires it, the trial judge should grant separate trials.[6] This Court set forth four factors that a trial court should consider when determining whether to sever defendants: "(1) problems involving a co-defendant's extra-judicial statements; (2) an absence of substantial independent competent evidence of the movant's guilt; (3) antagonistic defenses as between the co-defendant and the movant; and (4) difficulty in segregating the State's evidence as between the co-defendant and the movant."[7]

This Court reviews the trial court's decision on a motion to sever for abuse of discretion.[8] A trial judge's denial of a motion to sever will not be set aside on appeal

---

[6] *Skinner v. State*, 575 A.2d 1108, 1119 (Del. 1990); Super. Ct. Crim. R. 8(b).
[7] *Floudiotis v. State*, 726 A.2d 1196, 1210 (Del. 1999).
[8] *Winer v. State*, 950 A.2d 642, 648 (Del. 2008).

9

"unless [the] defendant demonstrates a reasonable probability that the joint trial caused substantial injustice."[9]

During trial, after Allen testified to his participation in the witness protection program, Otis moved to sever his case from Jeffrey's case. Otis argued that severance was required because he and his co-defendant sought to engage in different cross-examination strategies to address the witness protection issue. The Superior Court denied Otis's motion, finding:

> In this case, both the Defendants argue that one defendant's decision to cross-examine the State's witness regarding their participation in witness protection would prejudice the other defendant, whose trial strategy was to not address witness protection. However, neither of the Defendants' positions present separate defenses as to a State's witness's participation in witness protection, or otherwise, that the jury could only reasonably accept the core of if it rejects the core of the defense offered by his co-defendant. Moreover, neither of the Defendants testified or presented evidence that directly implicated the other in their own defense.

Otis argues that the differences between his and Jeffrey's cross-examination strategies for Allen created antagonistic defenses that compelled severance.

"[T]he presence of hostility between a defendant and his codefendant or 'mere inconsistencies in defenses or trial strategies' do not require a severance."[10] Jeffrey wanted to explore Allen's witness protection agreement on cross-examination. Otis did not want to address Allen's participation in the witness protection program.

---

[9] *Id.* (internal quotations omitted).
[10] *Outten v. State*, 650 A.2d 1291, 1298 (Del. 1994).

10

Their differing positions on cross-examination did not create a situation in which they were presenting separate defenses that required "the jury [to] reasonably accept the core of the defense offered by either defendant only if it reject[ed] the core of the defense offered by his codefendant."[11]

The trial judge instructed the jury to "weigh the evidence and apply the law individually to render separate verdicts as to each defendant." Juries are presumed to follow the court's instructions.[12] Otis has failed to demonstrate a "reasonable probability that substantial prejudice may [have resulted] from a joint trial."[13] The Superior Court properly exercised its discretion when it denied Otis's motion to sever the defendants' trials.

### *Joinder of Offenses Proper*

Prejudice from joinder of offenses may arise in the following three situations:

> [F]irst, when the jury might cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find; second, when the jury might use the evidence of one of the crimes to infer a general criminal disposition of the defendant in order to find guilt of the other crime or crimes; and, third, when the defendant might be subject to embarrassment or confusion in presenting different and separate defenses to different charges.[14]

---

[11] *Bradley v. State*, 559 A.2d 1234, 1241 (Del. 1989).
[12] *Revel v. State*, 956 A.2d 23, 27 (Del. 2008).
[13] *Skinner v. State*, 575 A.2d 1108, 1118 (Del. 1990).
[14] *Ashley v. State*, 85 A.3d 81, 84–85 (Del. 2014).

"The defendant has the burden of demonstrating such prejudice and mere hypothetical prejudice is not sufficient."[15]

Prior to trial, Otis moved to sever two charges of PDWBPP and the gang participation-related charges. The trial judge denied Otis's motion. On appeal, Otis argues that the joinder of the PDWBPP and Gang Participation charges demonstrated that he "was a felon and in fact used a gun previously during the commission of a crime" and that the jury "hear[d] evidence about the conduct of others that could be attributed to [him]." Otis also claims that joinder of the Gang Participation charges "would allow the [S]tate to introduce evidence about the conduct of these other people that otherwise would not be admissible." This Court considered, and rejected, similar arguments in *Taylor v. State*.[16]

In *Taylor*, Kevin Rasin, Taylor's co-defendant, argued that "the inclusion of the Gang Participation charge at his trial for Murder, Attempted Murder, and additional felonies was unfairly prejudicial to him because it allowed the State to proffer evidence that portrayed Rasin as a frequent drug dealer."[17] Rasin claimed that "without the Gang Participation charge, the State would not have been able to admit prior bad acts evidence during its case-in-chief."[18] The Court rejected Rasin's

---

[15] 575 A.2d at 1118.
[16] 76 A.3d 791 (Del. 2013).
[17] *Id.* at 800–01.
[18] *Id.* at 801.

argument, stating:

> Rasin's argument is premised on the assumption that evidence of his drug dealing would not have been admissible at a separate trial for the First Degree Murder Charge and his two Attempted First Degree Murder charges. That is not a sound premise. The State presented witnesses who portrayed Rasin as a frequent drug dealer between 2008 to 2010, and introduced his prior drug convictions during its case-in-chief. This evidence was relevant to prove the existence of a gang, as well as Rasin's knowing promotion of the TrapStars' criminal purpose. This same evidence also would have been admissible in a separate trial of Rasin's Murder, Attempted Murder, and additional felony charges. Gang motivation and retaliation would have been an important part of the State's case-in-chief to prove Rasin's motive to commit those violent crimes. Otherwise, the crimes would have seemed like random acts of violence. In sum, the evidence supporting the charges in the indictment was "inextricably intertwined" and, therefore, admissible. Because the evidence would have been admitted even if the charges were severed, the trial court acted well within its discretion in denying severance.[19]

"In determining whether the trial court abused its discretion [when denying a motion to sever charges], it is necessary to examine the facts in each case."[20] Otis was part of the Sure Shots and he engaged in violent acts with other members of the gang. The murder of Herman Curry was "inextricably intertwined" with the murder of Christopher Palmer, and the evidence relating to Palmer's murder was relevant in showing the motive behind Curry's murder. Gang motivation and retaliation were part of the State's case as it related to the Eden Park Homicides. The evening prior to those homicides, gang members were involved in an altercation at a nightclub

---

[19] *Id.*
[20] *Id.*

13

where two people were shot, one of whom, Kelmar Allen, was a Sure Shots member. Retaliation for the nightclub shooting was one of the motives behind the Eden Park Homicides. As was true in *Taylor*, "the evidence supporting the charges in the indictment was 'inextricably intertwined' and, therefore, admissible."[21]

The record reflects that the jury neither cumulated evidence among counts, nor inferred a criminal disposition to find Otis guilty. The trial judge instructed the jury to consider the evidence of each offense separately. The jury's verdict shows that they followed that instruction: finding Otis guilty of three lesser-included offenses, and acquitting him of one count of PFDCF and Conspiracy Second Degree. Accordingly, the record reflects the jury was able to distinguish the offenses and segregate the evidence.[22] Consequently, Otis has not demonstrated a "reasonable probability of substantial prejudice."[23]

### Co-Conspirator Statements

Under Delaware Rule of Evidence 801(D)(2)(E), statements made by co-conspirators during the course of a conspiracy are not hearsay if the offering party can show by a preponderance of the evidence that: (1) a conspiracy existed; (2) the co-conspirator and the defendant against whom the statement is offered were

---

[21] *Id.*

[22] *See Skinner v. State*, 575 A.2d 1108, 1118 (Del. 2008) (finding no abuse of discretion in denying severance where jury returned guilty verdicts on certain charges and not guilty verdicts on others).

[23] *Id.*

14

members of the conspiracy; and (3) the statement was made during and to further the conspiracy.[24]

Otis, and several others, including Allen and Seon, were charged with Gang Participation. The Delaware Criminal Code provides:

> A person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity and who knowingly promotes, furthers or assists in any criminal conduct by members of that gang which would constitute a felony under Delaware law, shall be guilty of illegal gang participation.[25]

To establish Gang Participation, the State must prove the existence of a "criminal street gang"[26] and a "pattern of criminal gang activity."[27] The predicate acts underlying Otis's Gang Participation charges included drug dealing, the shooting of Antoine Harris, the murder of Christopher Palmer, the Eden Park Homicides, and firearm possession attendant to those felonies. The State alleged that the charges

---

[24] *Lloyd v. State*, 534 A.2d 1262, 1264 (Del. 1987) (citing *Carter v. State*, 418 A.2d 989, 994 (Del. 1980)).

[25] 11 *Del. C.* § 616(b).

[26] 11 *Del C.* § 616(a)(1) defines a "criminal street gang" as:
> any ongoing organization, association, or group of 3 or more persons, whether formal or informal, having as 1 of its primary activities the commission of 1 or more of the criminal acts enumerated in paragraph (a)(2) of this section, having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity.

[27] 11 *Del C.* § 616(a)(2) defines a "pattern of criminal activity" as:
> the commission of attempted commission of, conspiracy to commit, solicitation of, or conviction of 2 or more of the following criminal offenses, provided that at least 1 of these offenses occurred after July 1, 2003, and that the last of those offenses occurred within 3 years after a prior offense, and provided that the offenses were committed on separate occasions, or by 2 or more persons.

15

related to these acts were committed in connection with the Sure Shots gang and, therefore, part of a conspiracy of criminal gang activity.

At trial, Allen testified that he heard Seon and other Sure Shots members plan to retaliate for the shooting of Williams. Allen also testified that he overheard a phone conversation between Otis and Seon immediately after the Eden Park Homicides. Finally, Allen testified that he transported illegal drugs for Seon. Otis contends that these portions of Allen's testimony are not excluded from the definition of hearsay under Rule 801(d)(2)(E), and should not have been admissible. Specifically, Otis argues that Allen was not a co-conspirator to the Eden Park Homicides and, therefore, Rule 801(d)(2)(E) is inapplicable.

Under Rule 801(d)(2)(E), the State was required to show that Seon, not Allen, was a co-conspirator. The State met this requirement. Seon's statements about members of a rival gang and about purchasing ammunition were made in the course of the Sure Shots' "pattern of criminal activity." In addition, Seon's statements during the phone conversation with Otis were made in furtherance of a conspiracy with Otis to perpetrate, and then flee from, the Eden Park Homicides. These murders were the predicate offenses underlying the Gang Participation charges. The evidence established that Seon and Otis, as well as other members of the Sure Shots, were part of the conspiracy to retaliate for the shooting of Williams and Allen. Accordingly, Seon's statements were not hearsay under Rule 801(d)(2)(E). The

16

State satisfied the foundational requirements, and the trial judge properly admitted the statements into evidence.[28]

Otis also argues that the admission of Seon's statements under Rule 801(d)(2)(E) violated his rights under the Confrontation Clause because he was unable to cross-examine Seon. In *Crawford v. Washington*,[29] the United States Supreme Court recognized that co-conspirator statements are not testimonial and do not implicate the Sixth Amendment.[30] Because Seon's statements were made in furtherance of a conspiracy, they are not testimonial. The Superior Court properly concluded that Otis's Sixth Amendment rights were not violated.

### Records of Conviction

On appeal, Otis also argues that his confrontation rights under the Sixth Amendment were violated because the certified conviction of Mahary Goode for Possession with Intent to Deliver a Schedule II Controlled Substance and the certified conviction of Jamel Chapman for Possession with Intent to Deliver a Schedule I Controlled Substance were admitted on the basis of their judgment of convictions, and without either of them testifying. The State admitted these convictions to establish that Sure Shots members "have engaged in a pattern of

---

[28] *Jones v. State*, 940 A.2d 1 (Del. 2007).
[29] 541 U.S. 36 (2004).
[30] *Id.* at 56. *See also Davis v. Washington*, 547 U.S. 813, 822 (2006); Jones *v. State*, 940 A.2d 1, 13–14 (Del. 2007) (citing *Crawford* and *Davis*).

criminal gang activity" as required under 11 *Del. C.* § 616(b).

The extent to which evidence like this can be used has been the subject of prior decisions of this Court in other contexts.[31] But, here, there is no need to address whether the trial court was correct in admitting this evidence in the face of the specific confrontation objection made by Otis.[32] We do not need to address this issue because, as the record makes clear, in finding Otis guilty of Gang Participation, the jury did not rely upon the convictions of either Goode or Chapman as evidence of the requisite "pattern of criminal gang activity."[33] Rather, the only crimes that the jury used as a predicate were the murder of Curry and the Possession of a Firearm During the Commission of a Felony.[34] For this reason, the admission of the evidence was harmless.[35]

### *Curry's Statement Properly Admitted*

On January 27, 2008, Herman Curry witnessed the murder of Christopher Palmer at a party in Wilmington. Curry saw Palmer turn a group of men away from the party, then saw one of the men begin firing a gun at Palmer. Curry knew the men to be members of the Sure Shots gang. Curry later made a statement to the police about the shooting and identified Otis in a photo lineup as Palmer's shooter.

---

[31] *See e.g., Allen v. State*, 878 A.2d 447 (2005); *Purnell v. State*, 106 A.3d 337, 350–51 (Del. 2014).
[32] This objection did not include an objection on the basis of the hearsay rule, by way of example.
[33] 11 *Del. C.* § 616(b).
[34] Trial Tr., 5, Nov. 21, 2014.
[35] Otis has not argued that the murder of Curry and the Possession of a Firearm During the Commission of a Felony do not adequately support the conviction for Gang Participation.

At the July 8, 2012 soccer tournament in Eden Park, Otis shot and killed Curry. It was later revealed that Otis told Jeffrey that Curry was "trying to take [Otis] down for a murder" and that Curry "needed to be taken care of."

The State filed a motion *in limine* to permit the admission of Curry's prior out-of-court statement identifying Otis as Palmer's shooter under the "forfeiture by wrongdoing" exception to the rule against hearsay. The State sought to admit the statement as evidence of Palmer's murder and as evidence of the motive for Curry's murder. The Superior Court granted the State's motion to admit the statement but "reserve[d] the right to revisit [the] decision based upon the testimony presented at trial as well as other hearings in this case."[36] The facts surrounding the Palmer and Curry murders were further developed at trial and evidenced Otis's intent to silence Curry as a witness.

"Forfeiture by wrongdoing" is a common law doctrine that permits "the introduction of statements of a witness who was 'detained' or 'kept away' by the 'means or procurement' of the defendant."[37] This doctrine has been recognized by the United States Supreme Court[38] and codified in both the Federal Rules of Evidence and the Delaware Rules of Evidence.[39] Rule 804(b)(c) provides: "A

---

[36] *State v. Phillips*, 2014 WL 3400965, at *3 (Del. Super. July 9, 2014).
[37] *Giles v. California*, 554 U.S. 353, 359 (2008).
[38] *Id.*
[39] D.R.E. 804(b)(6). *See also* D.R.E. 804 cmt. ("[D.R.E. 804(b)(6)] tracks F.R.E. 804(b)(6).").

19

statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" is "not excluded by the hearsay rule if the declarant is unavailable as a witness."[40]

The "forfeiture by wrongdoing" hearsay exception is "aimed at removing the otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them–in other words, it is grounded in the ability of courts to protect the integrity of their proceedings."[41] The "mere" elimination of a witness is insufficient to invoke the doctrine; rather, an admitting court must determine whether the defendant procured the absence of the witness as a means of silencing their testimony.[42] In *Davis v. Washington*,[43] the United States Supreme Court reiterated what it said in *Crawford*: that "the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds."[44] In *Davis*, the Supreme Court stated "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation."[45]

Federal courts assessing the admissibility of hearsay statements pursuant to the "forfeiture by wrongdoing" exception apply a three-pronged test, requiring the government to show: "(1) that the defendant engaged or acquiesced in wrongdoing,

---

[40] D.R.E. 804(b)(6).
[41] 544 U.S. at 374.
[42] *See id.* at 377.
[43] 547 U.S. 813 (2006).
[44] *Id.* at 833 (2006) (quoting *Crawford v. Washington*, 541 U.S. 36, 62 (2004)).
[45] *Id.*

20

(2) that the wrongdoing was intended to procure the declarant's unavailability, and (3) that the wrongdoing did procure the unavailability."[46]  While the defendant's intent to eliminate the witness's testimony must be established,[47] the State "need not [ ] show that the defendant's sole motivation was to procure the declarant's absence; rather, it need only show that the defense was motivated *in part* by a desire to silence the witness."[48]  In Delaware, a trial judge's ruling under this doctrine is reviewed for an abuse of discretion.[49]

The Superior Court concluded that Otis killed Curry, that Otis was aware that Curry was a witness who would be able to testify about Palmer's shooting, and that when Otis shot Curry he was "motivated at least *in part* by a desire to silence Curry as a witness to Palmer's murder."  The trial judge did not abuse his discretion in finding that "Otis Phillips engaged in wrongdoing which resulted in Curry's unavailability."[50]  We hold that the Superior Court did not err by admitting into evidence Curry's identification of Otis as Palmer's shooter.

### *Silence Comment Cured*

Clayon Green testified that he did not inform police investigators of everything he saw happen on July 8, 2012, but that he was "a hundred percent sure"

---

[46] *United States v. Baskerville*, 448 Fed. Appx. 243, 249 (3d Cir. 2011) (quoting *United States v. Scott*, 284 F.3d 758, 762 (7th Cir. 2002)).
[47] *Giles*, 554 U.S. at 377.
[48] *United States v. Dhinsa*, 243 F.3d 635, 653 (2d Cir. 2001) (internal quotations omitted).
[49] *Charbonneau v. State*, 904 A.2d 295, 318 (Del. 2006).
[50] *State v. Phillips*, 2014 WL 3400965, at *3 (Del. Super. July 9, 2004).

21

he saw Otis and Jeffrey at the Eden Park soccer tournament that day. When asked to explain his failure to be completely forthcoming at the outset, Green testified:

> Because it was a conscious decision not to really say everything I had seen. As I had mentioned before, I didn't know if these guys were caught or anything. That was, I would say, an hour or two after the whole incident. So, of course there was concern that, well, if I go out there and say Pluck brother come and shoot the man, then, of course, I'm opening up myself to get hurt for people who retaliate against all of that. So it was a conscious decision for me not to say everything that I know then. It's a sheep among the wolves. You guys are the shepherd, and I can't – it's not coming where I trust that, well, the cops really have our backs, so a way for me to say: Okay, this is what happened. And when the news media comes, then you tell them Otis and Badadan shoot up the park or none of that. So it wasn't – that was more of a conscious decision to say: Well, this is what happened, or I didn't see anything. If you think I'm lying, ask Otis and what's his name if I'm lying.

Otis moved for a mistrial. The Superior Court denied the request and instructed the jury to "disregard the last answer given by the witness." Otis argues on appeal that Green's comment, "If you think I'm lying, ask Otis and what's his name if I'm lying," infringes on Otis's "constitutional right to testify or not testify."

This Court applies a four-factor analysis to determine whether a mistrial should be granted in response to an allegedly prejudicial remark by a witness: first, the nature and frequency of the offending comment; second, the likelihood of resulting prejudice; third, the closeness of the case; and fourth, the adequacy of the

22

trial judge's actions to mitigate any potential prejudice.[51] In *Revel v. State*, this Court applied these four factors and concluded that a police officer's isolated and accidental reference to the defendant's exercise of his constitutional right to remain silent did not warrant a mistrial.[52] The facts in Otis's case support the same result.

To the extent that Green's comment prejudiced Otis, that prejudice was effectively cured by the trial court's immediate instruction. A mistrial should only be granted as a last resort when there are no alternatives, where there is "'manifest necessity' or the 'ends of public justice would otherwise be defeated.'"[53] "A trial judge's prompt curative instructions 'are presumed to cure error and adequately direct the jury to disregard statements.'"[54]

### *Jury Note Response Proper*

During jury deliberations, the trial judge received two notes. The first advised that a juror sought to be removed from the jury. The second, which immediately followed the first, read:

> We are not able to productively discuss the case due to the fact that one juror claims to not have collected any of the evidence presented from day one. She was told not to form an opinion from the start, and has

---

[51] *Revel v. State*, 956 A.2d 23, 27 (Del. 2008) (citing *Pena v. State*, 856 A.2d 548, 551–52 (Del. 2004).

[52] *Id.* at 30.

[53] *Id.* at 27 (quoting *Brown v. State*, 897 A.2d 748, 752 (Del. 2006)). *See also Fanning v. Superior Court*, 320 A.2d 343, 345 (Del. 1974); *Steckel v. State*, 711 A.2d 5, 11 (Del. 1998); *Bailey v. State*, 521 A.2d 1069, 1075–78 (Del. 1987).

[54] *Id.* (quoting *Pena v. State*, 856 A.2d 548, 551 (Del. 2004)). *See also Steckel*, 711 A.2d at 11; *Sawyer v. State*, 634 A.2d 377, 380 (Del. 1993); *Zimmerman v. State*, 628 A.2d 62, 66 (Del. 1993); *Pennell v. State*, 602 A.2d 48, 52 (Del. 1991).

interpreted that to mean that she should not be taking in information, putting it in perspective, and apply productive reasoning to determine whether the events occurred as the State's [sic] presents. She is upsetting all of the other jurors.

Otis initially suggested the trial judge respond to both notes by rereading the court's instruction on how a jury conducts its deliberations and adding that "they are the 12 that have to decide the case, there cannot be a substitution." Jeffrey did not want the trial judge to reread the note to the jury as part of the court's instruction, and Otis agreed. Jeffrey objected to the portion of the trial judge's proposed instruction which stated: "Delaware law does not permit the substitution of any juror once deliberations begin." On this point, Otis remained silent. The court noted Jeffrey's objection and instructed the jury:

> Good morning, ladies and gentlemen. In response to the note I received, please refer to the jury instructions on how to conduct jury deliberations. Delaware law does not permit the substitution of any juror once deliberations begin. Thank you. Would you please go back into the jury room.

Otis now claims that he joined in Jeffrey's objection and that the instruction "was coercive and premature." However, the record demonstrates that Otis objected to the rereading of the note, not to the substance of the instruction. Otis received the instruction he suggested, and the trial judge did not reread the jury note per his (and Jeffrey's) objection.

Otis acknowledges that the trial judge's instruction was a correct statement of the law. Under the Delaware Constitution, alternate jurors may not be substituted

24

during the deliberative process.[55] Otis contends, however, that the instruction was coercive because it was not accompanied by the admonition that "individual jurors should not surrender their convictions." This Court rejected that same argument in *Streitfeld v. State*.[56]

In *Streitfeld*, the jury informed the trial court that it was deadlocked after three hours of deliberation.[57] The trial judge gave an *Allen*[58] charge but failed to instruct the jurors not to surrender their personal convictions for the sake of reaching a verdict.[59] The defendant did not object to the charge as given.[60] This Court concluded that "[t]here was no suggestion therein that either side had to compromise a conviction to reach a verdict, nor was there any intimation that the jury would be held until a verdict was reached."[61]

In Otis's case, the Superior Court's instruction did not suggest to any juror that a particular course of action should be undertaken for the mere sake of reaching a verdict. This was not a situation in which the trial judge was giving an *Allen* charge to a deadlocked jury under circumstances that would have warranted a cautionary

---

[55] Super. Ct. Crim. R. 24(c). *See Claudio v. State*, 585 A.2d 1278, 1301 (holding "the substitution of an alternate juror deliberative process was in derogation of the common law [and] it was contrary to defendants' right to trial by jury").

[56] 369 A.2d 674 (Del. 1977).

[57] *Id.* at 677.

[58] *Allen v. United States*, 164 U.S. 492 (1986).

[59] *Streitfeld*, 369 A.2d at 677.

[60] *Id.*

[61] *Id.*

25

instruction. The trial judge properly exercised his discretion by providing the jury with an instruction that was an accurate statement of the law and that was not coercive.

### No Speedy Trial Violation

When determining whether a defendant has been deprived of his right to a speedy trial, courts assess the following four factors: "(1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of the right to a speedy trial, and (4) prejudice to the defendant."[62]

Otis claims that "the State delayed a Murder prosecution so unrelated charges could be added to the indictment." While the title of his argument in his Opening Brief suggests that he was prejudiced by a delay in his trial, Otis appears to argue that the Superior Court should have dismissed the case for a delay in the reindictment. Otis's argument is without merit.

Otis was arrested on July 8, 2012. He was indicted 106 days later, on October 22, 2012, on capital murder charges, with no right to bail. He was reindicted on February 18, 2013. The reindictment added several co-defendants and the gang participation-related charges. On March 18, 2013, Otis filed a Motion to Dismiss

---

[62] *Middlebrook v. State*, 802 A.2d 268, 273 (Del. 2002) (citing *Barker v. Wingo*, 407 U.S. 514, 533 (1972)). *See also Key v. State*, 463 A.2d 633, 636 (Del. 1983).

the charges, claiming a delay in indictment. On August 20, 2013, the Superior Court denied Otis's motion to dismiss, finding that he did not demonstrate prejudice.

On appeal, Otis concedes that there was no delay in the original indictment. His reindictment occurred 129 days after the original indictment. "There is no precise time period which uniformly triggers a speedy trial analysis."[63] In this case, any delay in reindictment was not of sufficient length to be prejudicial.

Otis claims that the reason for the delay was for the prosecution to "tack on unrelated charges." This Court has held that "[a] longer period of delay can be tolerated for serious, complex charges, such as murder in the first degree and multiple conspiracies."[64] In this case, the Eden Park Homicides led to a broader and more complex investigation tying these murders to the Sure Shots gang and its criminal enterprise. The reindictment was a result of that expanded investigation.

The addition of charges in the reindictment did not impair Otis's defense, lengthen his pre-trial incarceration, or cause additional anxiety and concern. Otis had already been charged with capital murder prior to his reindictment. Otis has failed to demonstrate prejudice. The Superior Court properly concluded that there was no violation of Otis's right to a speedy trial.

---

[63] *Skinner v. State*, 575 A.2d 1108, 1116 (Del. 1990).
[64] *Id.*

27

## *Conclusion*

The judgment of convictions by the Superior Court is affirmed. Otis's death sentence for Murder in the First Degree is vacated. This matter is remanded to the Superior Court for resentencing on that conviction to "imprisonment for the remainder of his natural life without benefit of probation or parole or any other reduction."[65]

---

[65] 11 *Del. C.* § 4209(d)(2).