Roger B. CORBITT, Jr., Plaintiff Below, Appellant,

v.

Vijay R. TATAGARI, M.D. and Bayhealth Medical Center, Inc., (previously known as Kent General Hospital), Defendants Below, Appellees.

No. 295, 2001.

Supreme Court of Delaware.

Submitted: June 4, 2002.
Decided: Aug. 16, 2002.

Stephen A. Hampton, Dover, Delaware, for Appellant.

Anne L. Naczi (argued) and Rebecca L. Trifillis, Griffin & Hackett, P.A., Georgetown, Delaware, for Appellee Vijay R. Tatagari, M.D.

Mason E. Turner, Jr., Prickett, Jones & Elliott, Wilmington, Delaware, for Appellee Bayhealth Medical Center, Inc.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER, and STEELE, Justices, constituting the Court En Banc.

WALSH, Justice.

In this appeal from the Superior Court, we consider the correctness of jury instructions given in a medical malpractice action. The plaintiff below alleged that both his family physician and an emergency room physician breached the standard of care by failing to diagnose him with appendicitis before his appendix ruptured. The jury was instructed on the applicable standard of care, as found in 18 *Del. C.* § 6801(7) *. The jury was further offered an explanation of the standard of care using language not found in the statute, but conforming to pattern jury instructions. It is this explanatory language that the plaintiff below objected to, arguing that it gave the impermissible impression that the standard of care is subjective in nature, and requires of a physician only good faith. The trial court overruled the plaintiff's objection, finding that the challenged language gave the jury a helpful, informative and accurate explanation of the standard of care. We agree and affirm.

I.

Appellant/plaintiff below Roger B. Corbitt, Jr. ("Corbitt") brought this medical malpractice action against Dr. Vijay R. Tatagari ("Dr. Tatagari") and Bayview Medical Center, Inc. ("Bayview") alleging that they should have diagnosed him with acute appendicitis and referred him to a surgeon in time to permit surgery before his appendix ruptured. Corbitt claims that the surgery and recovery time necessitated by his ruptured appendix was more extensive than if either Dr. Tatagari or Bayview had properly diagnosed his condition prior to his appendix rupturing. After trial, the jury returned a verdict for the defendants, Dr. Tatagari and Bayview. This appeal followed.

Corbitt began experiencing intense abdominal pain on the morning of December 24, 1996. The pain was such that Corbitt left work and drove two hours to see his family doctor, Dr. Tatagari. Corbitt testified at trial that the pain was so severe that he asked to lie down while waiting for Dr. Tatagari to see him. Dr. Tatagari testified, however, that when he saw Corbitt, Corbitt was sitting up and did not appear to be in extreme pain. Dr. Tatagari took a medical history from Corbitt and conducted a physical examination. When Dr. Tatagari examined Corbitt, he found that Corbitt's pain was in the epigastric region of the abdomen, which is located just above the stomach, under the rib cage. Corbitt did not indicate any pain in the right lower quadrant of his abdomen, where the appendix is located. Dr. Tatagari diagnosed Corbitt with either acute gastritis or peptic ulcer, which were both consistent with Corbitt's physical exam. Dr. Tatagari did not believe Corbitt was suffering from appendicitis because of the lack of pain in the right lower quadrant. Dr. Tatagari prescribed Prilo-

---

* This case involves the pre–1998 amendment to     18 *Del. C.* § 6801(7).

sec, a medication for both gastritis and ulcer, and advised Corbitt to go to the emergency room if his symptoms worsened.

Later that same afternoon, Corbitt's pain increased and he went to the emergency room at Kent General Hospital (now Bayview). At the emergency room, Corbitt was seen by Dr. Hamilton Carter ("Dr. Carter"). Dr. Carter read Corbitt's medical chart, conducted a physical examination, and ordered diagnostic tests, including an x-ray. Again, Corbitt indicated that the pain he was experiencing was limited to the epigastric region of his abdomen, not the right lower quadrant. By this time, Corbitt had also vomited blood, an indication that his stomach was bleeding, consistent with an ulcer. Dr. Carter reviewed the results of the x-ray and saw nothing that he felt would indicate an obstruction or appendicitis. The x-ray did indicate a small bit of matter, called a fecalith, in the area of the appendix, however. Corbitt argued to the jury that this indicated a problem with his appendix that should have been explored further, but Dr. Carter testified that given the absence of pain in the area, he did not believe appendicitis was a reasonable possibility. Although the x-ray technician indicated that consultation may be required, Dr. Carter did not consult anyone further regarding the x-ray results until after Corbitt had been discharged. Dr. Carter testified that consultation did not change his initial diagnosis, which excluded appendicitis as the cause of Corbitt's distress.

Dr. Carter believed that peptic ulcer was the most likely diagnosis, and he prescribed medication accordingly. Corbitt remained in the hospital and after four hours had passed while he was on the medication, Corbitt felt somewhat better. This improvement confirmed the diagnosis in Dr. Carter's mind and he discharged Corbitt with instructions to see his primary doctor within three days and return to the hospital if his symptoms worsened. For the next three days, Corbitt continued to experience pain. On December 27, 1996 a family member telephoned Dr. Tatagari's office and informed Dr. Tatagari's assistant that Corbitt was still in pain and now had blood in his urine. According to Dr. Tatagari, his assistant told Corbitt to go directly to the hospital. Corbitt denies that he was instructed to go to the hospital.

Then, on December 30, 1996, Corbitt again made an unscheduled visit to Dr. Tatagari's office. By this time, Corbitt reported to Dr. Tatagari that he had been experiencing fever and constipation for the previous two days. Also on this visit, for the first time, Corbitt indicated pain in the right lower quadrant of his abdomen. Dr. Tatagari suggested that Corbitt go to the hospital for further testing but Corbitt refused, so Dr. Tatagari referred him to a surgeon, Dr. Sidney Barnes ("Dr. Barnes"). Corbitt went to see Dr. Barnes that same day. Dr. Barnes examined Corbitt but found that he did not have a "surgical abdomen," and, therefore, Dr. Barnes thought it was unlikely Corbitt was suffering from appendicitis. According to Dr. Barnes, he did recommend further testing, but Corbitt elected not to pursue that route.

The following morning, December 31, Corbitt returned to Bayview in extreme pain. Dr. Barnes was called in to examine Corbitt and again did not believe Corbitt was suffering from appendicitis, but scheduled immediate surgery to explore the source of Corbitt's pain. During surgery, it was discovered that Corbitt's appendix had ruptured, probably sometime during the previous night. As previously noted, Corbitt contends that the surgery was more extensive and the recovery time more prolonged because he did not have

his appendix removed until it had already ruptured.

In his complaint, Corbitt alleged that both Dr. Tatagari and Dr. Carter breached the applicable standard of care on December 24 by failing to take an adequate history and performing incomplete physical examinations, particularly in failing to conduct a rectal exam. Corbitt further claimed that Dr. Tatagari had breached the standard of care by failing to instruct him to go to the hospital on December 27, and failing to diagnose appendicitis on December 30. Finally, Corbitt alleged Dr. Carter was negligent on December 24 in his reading of the x-ray, which showed the presence of a fecalith.

At the trial in this matter, it was elicited that Dr. Tatagari is an internist, or a general physician for adults, and that he is foreign born and foreign educated. There was further testimony that, although the standard for detecting appendicitis is the same for all physicians, only a surgeon, such as Dr. Barnes, can render the required treatment for appendicitis, which is surgery. Furthermore, there was evidence that Dr. Carter had not passed the certification boards for emergency medicine, despite having taken the examination two or three times. In addition to these attacks on the defendants' competence, both sides presented expert testimony on whether or not Dr. Tatagari and Dr. Carter had met the standard of care. As to the December 27 telephone call, Corbitt's expert indicated that Dr. Tatagari would have met the standard of care if he instructed Corbitt to go to the hospital, or if he had told Corbitt to come directly to his office.

At the close of the case, the jury was instructed with the standard medical malpractice jury instruction, which reads as follows:

> Under a Delaware statute, a healthcare provider that does not meet the applicable standard of care commits medical malpractice: The standard of skill and care required of every healthcare provider in rendering professional services or healthcare to a patient shall be that degree of skill and care ordinarily employed, under similar circumstances, by members of the profession in good standing in the same community or locality, and the use of reasonable care and diligence.

> \* \* \*

> Each physician and healthcare provider is held to the standard of care and knowledge commonly possessed by members of his or her profession and specialty in good standing. It is not the standard of care of the most highly skilled, nor is it necessarily that of average members of this profession, since those who have somewhat less than average skills may still possess the degree of skill and care to treat patients competently. When a physician chooses between appropriate alternative medical treatments, harm resulting from a physician's good faith choice of one proper alternative over the other is not medical malpractice.

Corbitt objected to the last three sentences of this instruction, arguing that they improperly characterized the standard of care as a subjective determination and that there was no evidence to support an alternative treatment instruction. Corbitt's objection was overruled. Following the defense verdict, Corbitt moved for a new trial on the ground that these three sentences rendered the jury instructions improper. The trial court denied Corbitt's motion, finding that the sentences provided a helpful explanation of the statutory language and that, although not entirely applicable in this case, the alternative treatment instruction was proper because

the doctors did make choices about Corbitt's treatment.

## II.

██ We review *de novo* the Superior Court's decision to issue the challenged jury instructions. *North v. Owens–Corning Fiberglas Corp.*, 704 A.2d 835, 837 (Del.1997).

██ When the correctness of a jury instruction is raised on appeal, our analysis focuses "not on whether any special words were used, but whether the instruction correctly stated the law and enabled the jury to perform its duty." *Cabrera v. State*, 747 A.2d 543, 545 (Del.2000). Generally, jury instructions must give a correct statement of the substance of the law and must be "reasonably informative and not misleading." *Id.* at 544. The instructions need not be perfect, however, and a party does not have a right to a particular instruction in a particular form. *Haas v. United Technologies Corp.*, 450 A.2d 1173, 1179 (Del.1982); *Chavin v. Cope*, 243 A.2d 694 (Del.1968). In evaluating the propriety of a jury charge, the instructions must be viewed as a whole. *Culver v. Bennett*, 588 A.2d 1094, 1096 (Del.1991).

██ The trial court here relied on the pattern civil jury instructions for medical malpractice. While the pattern instructions continue to be a valuable resource and should be consulted in the first instance, they are not dispositive. *Cabrera*, 747 A.2d at 545. As the introduction to the pattern instructions notes, they are intended as guidelines and should be used in cases only where they are applicable. The pattern instructions may require modification or supplementation, depending upon the issues of fact and law presented at the trial. *Id.* This is a case in which it would have been prudent to modify the pattern instructions to more closely reflect the particular facts at issue. Nonetheless, on the whole, the instructions given by the trial judge were calculated to be reasonably informative and were not misleading.

██ The first sentence of the jury instructions Corbitt objects to is that "[e]ach physician and healthcare provider is held to the standard of care and knowledge commonly possessed by members of his or her profession and specialty in good standing." In particular, Corbitt argues that "knowledge" is not included in the statutory definition of standard of care, and its inclusion in the instruction may have led the jury to believe that the standard of care is variable, based on a particular physician's level of knowledge. Further, Corbitt asserts, the reference to "specialty" could have misled the jury to assume that only a specialist could have diagnosed Corbitt's appendicitis. Both of these arguments are rebutted by a fair reading of the entire contents of the jury charge, however.

██ The substitution of "knowledge" for "skill" does not render the instruction faulty. Although the two words are not entirely interchangeable, one's knowledge is a function of one's skill level. *See* Webster's Third New International Dictionary 2133 (unabr.1993) (defining skill as "the ability to use one's knowledge effectively and readily in execution or performance"). Further, although the instruction begins with "each physician," it also makes clear that the relevant standard of care is that "commonly possessed" by other physicians in "good standing." This is simply a synonym for the statutory language referring to the degree of skill and care "ordinarily employed." Using words other than those found in the statute is permissible, so long as the chosen phrase does not contradict the statutory mandate or change its intended meaning. Restating the law using alternate language is helpful to juries who, as laypersons, are trying to make sense of often lengthy and sometimes legally

phrased instructions. The challenged sentence does not conflict with the statute.

The insertion of the word "specialty" in the instruction is a recognition of the fact that experts specializing in a particular field of study are held to the standard of care employed by others in that same field. Di Filippo v. Preston, 173 A.2d 333, 336 (Del.1961). In this case, Dr. Tatagari did not hold himself out as a specialist. Dr. Carter, however, is an emergency room physician and testified to the standard of care required of those in emergency medicine. Given this testimony, it was not error to include a reference to specialty in the jury instructions.

### III.

■ The second sentence Corbitt challenges is: "It is not the standard of care of the most highly skilled, nor is it necessarily that of average members of this profession, since those who have somewhat less than average skills may still possess the degree of skill and care to treat patients competently." Corbitt argues that this sentence, particularly in combination with the first sentence, may have led the jury to believe that the standard of care is a sliding scale depending upon the physician's level of knowledge and skill. On the contrary, in our view this sentence imparts to the jury the sense that the standard of care is judged by the reasonable physician in similar circumstances. The standard of care has never required that physicians be the most highly skilled in their field, indeed, the majority of physicians could not meet such a standard. The standard of care is comparative, however, and this jury instruction was attempting to convey that idea to the jury in an understandable fashion.

Additionally, while we do not endorse the above quoted language as universally applicable, we cannot say that its inclusion was error in this case. Corbitt's case had

less to do with the standard of care and more to do with proximate cause. There was little dispute about what the standard of care required of Dr. Tatagari and Dr. Carter, the question was, given the facts of this case, whether the actions (or inactions) of Dr. Tatagari and Dr. Carter caused Corbitt injury by delaying his appendectomy until after his appendix ruptured. Because Corbitt was referred to a surgeon before his appendix ruptured, the jury could have concluded that any deviations from the standard of care on the part of physicians who saw him previously were immaterial, and not the proximate cause of Corbitt's alleged injuries.

### IV.

■ Corbitt further contends that there was no evidentiary basis to support the following jury instruction: "When a physician chooses between appropriate alternative medical treatments, harm resulting from a physician's good faith choice of one proper alternative over the other is not medical malpractice." Unlike the other two sentences challenged, this Court specifically approved the "alternative treatment" instruction in *Riggins v. Mauriello*, 603 A.2d 827, 829–31 (Del.1992). Although Corbitt argues that many states have abandoned similar instructions because they tend to excuse any physician acting in good faith, we do not so read Delaware's alternative treatment instruction. Indeed, the instruction speaks of "appropriate" and "proper" alternatives, not any alternative that exists. We believe this distinction, in conjunction with the remainder of the charge, adequately conveys to the jury that the given alternatives must themselves be reasonable and must meet the standard of care. Compare *Das v. Thani*, 171 N.J. 518, 795 A.2d 876 (2002).

Finally, Corbitt's continual reference to this case as one involving only misdiagno-

sis, not any alternative treatments, is somewhat simplistic. As with any alleged medical malpractice action, the physician defendants had treatment choices to make given the facts and symptoms observed. Initial diagnoses are not always set in stone, but evolve, given changes in the patient's circumstances and response to treatment. Although Dr. Tatagari and Dr. Carter recommended treatment based on their initial misdiagnosis, each was making choices about appropriate treatment alternatives. This is not to say, however, that the alternative treatment instruction is appropriate in every case. We merely note that here, the instruction was not so unsubstantiated as to render its inclusion reversible error. Indeed, in light of the evidence presented below, it would have been more appropriate for the Superior Court to eliminate the reference to alternative treatment from the jury instruction. We are satisfied, however, that the defect in the Superior Court's instruction did not interfere with the jury's ability to perform its duty intelligently. See *Asbestos Litigation Pusey Trial Group v. Owens–Corning Fiberglas Corp.*, 669 A.2d 108, 113 (Del. 1995) (noting a verdict based upon erroneous jury instructions will be set aside only if "deficiencies in the instructions given by the trial judge undermined the jury's ability to perform its duty intelligently in returning a verdict").

In the final analysis, the issue posed at trial was whether the plaintiff satisfied the burden of proving that Dr. Tatagari and/or Dr. Carter failed to diagnose and treat him in conformity with the standard of medical care of the community in which they practiced. While the jury instructions might have been more specific, they conveyed to the jury the appropriate legal basis for assessing the duties of both physicians and were thus a correct statement of the law. The evidence presented at trial posed the factual issue of conformity with applicable standards, with expert opinion on each side of that dispute. The jury resolved that issue adverse to the plaintiff. We are unable to conclude that the jury instructions which formed the legal framework for that determination were erroneous. Given our standard of review, we must accordingly affirm.