IN THE SUPREME COURT OF THE STATE OF DELAWARE

TYLER FORD,

Defendant Below,
Appellant,

v.

STATE OF DELAWARE,

Appellee.

§
§    No. 299, 2023
§
§
§    Court Below:  Superior Court
§    of the State of Delaware
§
§    Cr. ID No. 2104011636 (N)
§
§
§

Submitted:  February 12, 2025
Decided:    May 1, 2025

Before **SEITZ**, Chief Justice; **TRAYNOR** and **LEGROW**, Justices.

Upon appeal from the Superior Court.  **AFFIRMED**.

Joe Hurley, Esquire, Wilmington, Delaware, *for Appellant Tyler Ford*.

Julie M. Donoghue, Esquire, Delaware Department of Justice, Wilmington, Delaware, *for Appellee State of Delaware*.

**LEGROW**, Justice:

This appeal arises out of a fatal automobile collision. Tyler Ford raced his friend toward a busy intersection, drove through a red light, and killed an innocent driver who entered the intersection with a green light. A jury convicted Ford of second-degree murder and related traffic offenses. On appeal, Ford asserts that the Superior Court (i) abused its discretion when it denied his motion for judgment of acquittal; (ii) abused its discretion when it denied his motion for a new trial; (iii) erred or abused its discretion when it instructed the jury; and (iv) improperly admitted portions of a video that captured the collision.

Ford conceded to the jury that his reckless driving caused the fatality. The primary issue at trial was whether his conduct exhibited the necessary mental state to support a second-degree murder charge. The evidence presented on Ford's mental state required the jury to make credibility determinations, and its verdict on the second degree-murder charge was not against the weight of the evidence. The jury instructions also do not warrant reversal because they correctly conveyed the applicable law. Likewise, the challenged video accurately reflected the scene and was not gruesome, so the Superior Court did not abuse its discretion by admitting it. We affirm Ford's convictions.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Factual Background

On October 8, 2020 at 4:36 p.m., Tyler Ford and his friend, Kyle Fischer, were driving in separate cars on Route 40. While stopped at the intersection of Routes 40 and 896, Ford and Fisher rolled down their windows, spoke to each other, and laughed. After the light turned green, Ford drove his Saab at a high rate of speed along Route 40, weaving between cars without using a turn signal and drawing very close to other cars. Ford and Fischer were engaged in what appeared to be a race through the busy traffic.[1]

Route 40 curved as it approached an intersection with LaGrange Parkway.[2] This bend had several signs, the first of which was visible one-third of a mile from the intersection. That first sign was located on the driver's side of Ford's car and indicated that a traffic light was ahead. Less than twenty feet past that sign, the traffic light itself was visible to approaching drivers. Approximately 700 feet from the intersection, another sign warned of the oncoming traffic light. Finally, about 400 feet from the intersection, another sign indicated that a right-turn-only lane was beginning.

---

[1] *See* App. to State's Answering Br. at B14, 23 ("they were engaged in activity, like racing each other") [citations to the Appendix of the State's Answering Brief are hereafter referred to as B__]; B45 (Q: "did you get the impress . . . he and the driver were having some kind of – I won't say race, but a competition?" A: "That's the impression I got, yes").

[2] *See* State's Trial Ex. 51 (Google Earth image of Route 40).

2

As Ford and Fischer were speeding toward this intersection, they drove along the shoulder and passed a DART bus. A camera on the bus captured most of what occurred next. As Ford approached the intersection, the traffic light was already red. According to Corporal John Breen—the accident reconstruction officer and investigator for this collision—the light was red the entire time that it was visible to Ford, starting more than 800 feet from the intersection. A car was stopped in Ford's lane of travel. Ford loudly honked his horn as he approached the intersection. He then steered around stopped traffic into the right-turn-only lane and continued into the busy intersection.

In the intersection, Ford struck a motorist in an Explorer, who had a green light and was driving straight. The Explorer spun around the intersection and exploded, killing the driver, Nathaniel Milton. Milton's cause of death was found to be blunt-force trauma. Ford's car also caught fire, but Fischer helped him escape the vehicle. The Explorer then exploded a second time. At trial, Cpl. Breen estimated that Ford was driving between 91 and 96 miles per hour at the time of impact.[3] There was no physical evidence at the scene that Ford applied his brakes, and no witness testified to seeing brake lights. Fischer successfully stopped his vehicle before entering the intersection.

---

[3] B180–81, 183–84, 188.

3

Sitting on the curb after the collision, Ford called his mother and said: "Mom, I've been in an accident. It's very bad. I don't know if they got out."[4] He continued, "It happened so fast. I couldn't stop. I tried."[5] An ambulance took Ford to the hospital. Ford's mother later testified that he seemed very upset when she spoke to him at the hospital.

Cpl. Breen met Ford at the hospital and read him his Miranda rights, which Ford waived. Ford gave a statement in which he admitted to smoking "CBD" at 5:00 a.m. that morning, driving the Saab, and driving alongside Fischer. Ford stated, however, that he had swerved into the turn lane and entered the intersection because of problems with his brakes. Specifically, Ford said that he thought he needed to tap the brakes for them to work properly and that nothing happened when he put the brake pedal to the floor.[6]

A mechanic employed by the State inspected Ford's Saab twice after the collision and could not identify any problem with its brakes. At trial, Ford's father

---

[4] App. to Opening Br. at A90–91 [citations to the Appendix of Ford's Opening Brief are hereafter referred to as A__].

[5] A91.

[6] *See* B341 (State's audio interview with Ford in the hospital at 6:35–7:09) ("Before I even swerved over I was on the brakes, I was braking . . . . so I kind of panicked when I first saw the car in front of me, thinking I was going to T-bone him, so I kind of hit the brakes, but you aren't supposed to slam on them, you tap them, so I tapped a few times but I wasn't stopping fast enough so I kind of swerved over, and then I actually put my foot on the brakes and I couldn't really feel anything so that's when I swerved over.").

testified that he had tested the brakes and they were working properly. One witness testified that he saw the back of Ford's car and that Ford's brake light did not come on when traveling into the intersection. Cpl. Breen inspected the scene after the collision and did not see any skid marks that would indicate that Ford's wheels locked due to braking. Cpl. Breen testified that Ford took no evasive actions in the intersection.

## B. Procedural Background

On April 26, 2021, a grand jury indicted Ford for second-degree murder, driving under the influence, two counts of improper passing on the right, and disregarding a red light.[7] Ford was indicted under two different DUI theories: driving under the influence and driving "with a prohibited drug content" under 21 *Del. C.* § 4177(a)(6).[8]

On October 3, 2022, Ford's jury trial began.[9] On October 7, mid-trial, Ford pleaded guilty to DUI "with a prohibited drug content," but the "driving under the influence" DUI theory was submitted to the jury.[10] In addition to the second-degree murder charge, the jury also considered two lesser-included offenses: manslaughter

---

[7] Indictment (Apr. 26, 2021), *State v. Ford*, Cr. ID No. 2104011636 (N), Superior Court Docket No. 1. [Hereafter "Super. Dkt. __" will refer to the Superior Court docket item numbers in *State v. Ford*, Cr. ID No. 2104011636 (N)].

[8] Super. Dkt. 2.

[9] Super. Dkt. 37.

[10] Super. Dkt. 54.

5

and first-degree vehicular homicide.[11] On October 12, 2022, the jury convicted Ford of second-degree murder, both improper passing charges, and disregarding a red light,[12] but acquitted him of the second DUI charge.[13]

When the State rested its case-in-chief, Ford's counsel moved for judgment of acquittal on the second-degree murder charge, which the Superior Court denied.[14] After the jury returned its verdict, Ford filed a motion for a new trial and a motion for judgment of acquittal.[15] The Superior Court denied both post-trial motions in a written opinion.[16] The court later sentenced Ford to seventeen years of incarceration.[17] Ford then filed this appeal.

## II.   ANALYSIS

Ford raises four[18] issues on appeal that he contends warrant reversal of his second-degree murder conviction: (1) the Superior Court abused its discretion in

---

[11] *Id.*

[12] Super. Dkt. 46, 47, 48.

[13] Super. Dkt. 48.

[14] Trial Tr. at 157–159, 164 (October 6, 2022); *State v. Ford*, 293 A.3d 372 (Del. Super. 2023) [hereinafter Trial. Tr. at __ (Date)].

[15] Super. Dkt. 52, 53, 56, 57.

[16] *Ford*, 293 A.3d 372.

[17] Super. Dkt. 74, 77.

[18] Ford's Opening Brief contains six separate argument sections, but he conceded the first issue in his Reply Brief, and the fifth and sixth issues both concern whether the DART bus video was unduly prejudicial. *See* Appellant's Opening Br. at 8–12; Appellant's Reply Br. at 1 ("Defendant Ford . . . cannot demonstrate, based upon the record below, that the State has no legitimate basis, in the exercise of Its [sic] discretion, for Its [sic] prosecution of only Ford thereafter and withdraws this application only.").

denying his motion for judgment of acquittal; (2) the Superior Court abused its discretion in denying his motion for a new trial because Ford's *mens rea* was not sufficient to constitute "cruel, wicked and depraved indifference to human life" for the purpose of second-degree murder; (3) the Superior Court made several reversible errors in instructing the jury; and (4) the DART bus video should not have been shown to the jury during trial nor made available to them during deliberations. The State avers that none of these issues constitute reversible error, arguing that: (i) Ford waived his claim regarding the motion for judgment of acquittal because his opening brief contains no legal argument; (ii) the weight of the evidence did not preponderate against the jury's verdict on second-degree murder; (iii) any errors in the jury instructions were not significant enough to warrant reversal; and (iv) the DART bus video was not unduly prejudicial. For the reasons set forth below, we affirm the Superior Court's holdings and Ford's convictions.

### A.	Ford waived his appellate claim regarding the motion for judgment of acquittal.

The failure to advance a legal argument in an opening brief constitutes a waiver of the argument on appeal.[19] Ford's opening brief contains no citation to any

---

[19] *Flamer v. State*, 953 A.2d 130, 134 (Del. 2008) ("The failure to cite any authority in support of a legal argument constitutes a waiver of the issue on appeal."); *Roca v. E.I. du Pont de Nemours & Co.*, 842 A.2d 1238, 1242 (Del. 2004) ("It is well established that 'to assure consideration of an issue by the court, the appellant must both raise it in [the Summary of the Argument] and pursue it in the Argument portion of the brief.'") (quoting Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3974.1, at 504–08 (1999 and Supp. 2003)); *Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993); *Stilwell v. Parsons*, 145 A.2d 397, 402 (Del. 1958).

law whatsoever beyond the title of the section and the standard of review.[20] The argument section simply lists twelve facts without any discussion (much less legal argument) regarding how or why these facts warrant reversal.[21] Ford therefore waived this claim on appeal. Moreover, even if we could conclude that the claim was not waived, a reasonable juror could have found Ford guilty beyond a reasonable doubt of second-degree murder for the reasons explained below.

**B. The Superior Court did not abuse its discretion when it denied Ford's motion for a new trial.**

Ford contends that the interest of justice required the Superior Court to grant him a new trial under Superior Court Criminal Rule 33 because the evidence of his state of mind was not sufficient to show the required "circumstances which manifest a cruel, wicked and depraved indifference to human life" under the second-degree murder statute.[22] The State counters that there was more than enough evidence that Ford's mental state met the statutory requirement of second-degree murder.[23]

Superior Court Criminal Rule 33 provides that the "court on motion of a defendant may grant a new trial . . . if required in the interest of justice."[24] We

---

[20] Appellant's Opening Br. at 13.

[21] *Id.* at 14–17.

[22] *Id.* at 20–21; *see* 11 *Del. C.* § 635(1).

[23] State's Answering Br. 19–20, 23–26.

[24] Del. Super. Ct. Crim. R. 33.

review a denial of a motion for a new trial under an abuse of discretion standard.[25] Historically, Delaware courts have exercised their power to grant a new trial with caution and extreme deference to the jury's findings.[26] A court will not set aside a jury's verdict unless "the evidence preponderates so heavily against the jury verdict that a reasonable juror could not have reached the result."[27] "[W]hen the determination hinges on witness credibility, we do not substitute our opinion for that of the trier of fact."[28]

Second-degree murder requires the State to prove that the defendant's state of mind manifested a "cruel, wicked and depraved indifference to human life."[29] Mere recklessness in operating an automobile cannot sustain a second-degree murder conviction.[30] "In many, perhaps most cases, whether a reckless act rises to the level

---

[25] *Amalfitano v. Baker*, 794 A.2d 575, 577 (Del. 2001); *Storey v. Camper*, 401 A.2d 458, 465 (Del. 1979); *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004) ("[T]he trial court should not grant a motion for new trial unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict.") (internal citations omitted).

[26] *Amalfitano*, 794 A.2d at 577; *Lacey v. Beck*, 161 A.2d 579 (Del. Super. 1960).

[27] *Amalfitano*, 794 A.2d at 577; *Storey*, 401 A.2d at 465.

[28] *Steele v. State*, 319 A.3d 267, 2024 WL 1696794, at *3 (Del. Apr. 19, 2024) (TABLE).

[29] 11 *Del. C.* § 635(1); *see also* Super. Ct. Pattern Crim. Jury Instr. Murder in the Second Degree [Reckless Indifference].

[30] Whether an automobile crash constitutes "depraved indifference" murder has engendered significant litigation and discourse. *Compare People v. Maldonado*, 24 N.Y.3d 48, 60 (N.Y. 2014) (holding automobile death was not murder when the defendant was running from police because he later intentionally crashed the car to avoid hitting more pedestrians and showed remorse), *and People v. France*, 394 N.Y.S.2d 891 (N.Y. App. Div. 1977) (speeding at 3:00 a.m. and ignoring traffic signals in high-speed escape from the police did not constitute second-degree murder), *with People v. Heidgen*, 22 N.Y.3d 259 (N.Y. 2013) (the *mens rea* of "depraved indifference" murder was satisfied when the defendant engaged in a high speed game of chicken), *State v. Doub*, 32

of second-degree murder is a determination for the jury to make."[31]  This Court's

role is not to re-weigh the evidence.[32]

In *McKinley v. State*,[33] we held that a person can be convicted of second-

degree murder for operating a motor vehicle with a "cruel, wicked and depraved

indifference" if the specific facts of the case support such a finding beyond a

reasonable doubt.  In *McKinley*, the defendant was speeding while fleeing from

police.[34]  He disregarded several stop signs and at times drove on the wrong side of

---

Kan.App.2d 1087, 1091 (Kan. 2004) (finding the *mens rea* for murder was satisfied when the defendant was under the influence of crack cocaine and alcohol and ignored commands to stop), *and State v. Trott*, 130 S.E. 627, 630 (N.C. 1925) (finding "depraved" mind murder when the defendant drove his car at a high speed down a main street resulting in the death of the victim); *see also People v. Suarez*, 6 N.Y.3d 202, 210 (N.Y. 2005) (discussing the requirements of "depraved" murder in New York); 1 Sir Matthew Hale, The History of Pleas of the Crown at 476 (Sollom Emlyn of Lincoln's-Inn, Esq. 1800) ("If a man or boy riding in the street whip his horse to put him into speed, and run over a child and kill him, this is homicide, and not *per infortunium*, and if he ride so in a press of people with intent to do hurt, and the horse had kild another, it had been murder in the rider."); *see generally* Brian F. Allen, *A Step in the Right Direction: People v. Hafeez Stopping the Expansion of Depraved Indifference Murder in New York State*, 18 St. John's J. Civ. Rts. & Econ. Dev.  875 (2004).

[31] *Virdin v. State*, 780 A.2d 1024, 1034 (Del. 2001).

[32] *See Arrants v. Home Depot*, 65 A.3d 601, 605 (Del. 2013) ("Appellate courts do not weigh the evidence, determine questions of credibility, or make factual findings.") (citing *Person–Gaines v. Pepco Holdings, Inc.*, 981 A.2d 1159, 1161 (Del. 2009); *United States v. Callahan*, 801 F.3d 606, 617 (6th Cir. 2015) ("We simply review the evidence and the district court's ruling, and we reverse only if we have 'a definite and firm conviction' that the district court committed 'a clear error of judgment.'") (quoting *United States v. Kuehne*, 547 F.3d 667, 692 (6th Cir. 2008)); *Butcher v. United States*, 368 F.3d 1290, 1297 (11th Cir. 2004) ("[T]he court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.  The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.") (quoting *United States v. Martinez*, 763 F.2d 1297, 1312–13 (11th Cir. 1985)).

[33] 945 A.2d 1158 (Del. 2008).

[34] *Id.* at 1159.

the roadway.[35] McKinley's speed exceeded 100 miles per hour at times, and he was travelling between 88 to 98 miles per hour when he collided with an innocent driver.[36] Before the accident, he had been charged with drag racing and had been warned that he would kill someone if he continued to drive in that manner.[37] Under those circumstances, we upheld McKinley's second-degree murder conviction.[38]

In *McKinley*, this Court connected the "cruel, wicked and depraved indifference" requirement to the common law notion of "malice," which can be implied by circumstance.[39] We held that the State can prove implied malice "by the character of the fatal attack and the surrounding circumstances," "where the intentional acts (of the defendant) were so fraught with danger [or] so likely to cause death or great bodily harm."[40]

In denying Ford's motion for a new trial, the Superior Court held that the evidence did not preponderate so heavily against his conviction that a reasonable jury could not have reached the result. The court explained:

---

[35] *Id.*

[36] *Id.* at 1164.

[37] *Id.* at 1165 ("The trial judge was also able to consider McKinley's license suspensions and the official warnings he had received from both police and a judicial officer as evidence of a 'general reckless disregard of human life with a heart and mind void of a just sense of social duty that was fatally bent on mischief.'").

[38] *Id.* at 1166.

[39] *See id.* at 1162; *see also Waters v. State*, 443 A.2d at 504–05 (explaining malice); *State v. Winsett*, 205 A.2d 510, 515 (Del. Super. 1964) (explaining malice).

[40] *McKinley*, 945 A.2d at 1163.

And, having heard both sides, the jury unanimously agreed Mr. Ford recklessly caused Mr. Milton's death under circumstances constituting a cruel, wicked, and depraved indifference to human life. As a matter of law, the Court cannot say the jury's assessment of all the evidence, including Mr. Ford's story, was wrong.[41]

On appeal, Ford points to evidence from which his trial counsel argued to the jury that Ford's conduct, although reckless, did not exhibit cruel, wicked, and depraved indifference to human life. Ford identifies several pieces of evidence that he contends disprove that he exhibited the requisite *mens rea*: he displayed remorse after the accident;[42] he pulled into the right-turn-only lane and honked his horn in order to evade stopped cars and warn other drivers in the intersection;[43] and he claimed that his car had malfunctioning brakes which caused him to not be able to stop.[44] Additionally, the intersection came after a curve in the road, and it was the State's obligation to show how and when the intersection was visible to Ford.[45] Finally, Ford contends that because he was found not guilty for driving under the influence, he should have been acquitted of the second-degree murder charge as

---

[41] *Ford*, 293 A.3d at 379.

[42] Opening Br. at 21.

[43] *Id.* at 23.

[44] *Id.* at 22–23.

[45] *Id.* at 24–25.

well.[46] Some jurisdictions point to driver impairment as one factor that supports a "depraved mind" murder conviction.[47]

This evidence, however, was not the only evidence that the jury considered. The State presented evidence that Ford raced Fischer toward the intersection going at least 91 miles per hour. Multiple signs warned of the oncoming intersection. The traffic light was visible—and red—with enough time that Fischer was able to stop, but Ford instead pulled around stopped traffic and proceeded straight into the intersection. The jury also viewed video evidence of the accident and Ford's reckless driving immediately before the collision. Whether Ford saw the warning signs or attempted to apply the brakes were all determinations for the jury to make. It was reasonable for the jury to conclude that Ford did not attempt to brake at all, as Cpl. Breen and another eyewitness testified, particularly since neither the State's mechanic nor Ford's father found a problem with the Saab's brakes.

A reasonable jury could conclude from the evidence that Ford did not attempt to stop and intentionally entered the busy intersection at 91 miles per hour through

---

[46] Super. Dkt. 48.

[47] *See, e.g.*, *Heidgen*, 22 N.Y.3d at 277 (intoxicated driver speeding on the wrong side of the highway was sufficient for depraved mind murder); *Doub*, 32 Kan. App. 2d 1087 (intoxicated driver who had consumed alcohol and cocaine and ignored commands to stop was sufficient for depraved heart murder); *People v. Williams*, 55 N.Y.S.3d 381, 385 (N.Y. App. Div. 2017) (intoxicated driver with BAC of .25% and high on marijuana while engaged in a high-speed chase through residential neighborhoods was sufficient for depraved mind murder); *People v. Wells*, 862 N.Y.S.2d 20, 27 (N.Y App. Div. 2008) (intoxicated driver driving at high rate of speed through red lights was sufficient for depraved mind murder).

a visible red light.  That conduct created a situation so fraught with danger and likely to cause bodily harm that it manifested a cruel, wicked, and depraved indifference to human life.  The evidence therefore did not preponderate against the verdict, and the Superior Court did not abuse its discretion by denying Ford's motion for a new trial.

### C.     The Superior Court did not commit a reversible error in instructing the jury.

Ford identifies several purported errors in the jury instructions, only one of which he raised at trial.[48]  The State responds that the jury instructions were correct, and to the extent that the trial judge misread them to the jury, the written instructions were accurate and any mistake in the oral instructions did not amount to a reversible error.[49]

This Court reviews *de novo* the Superior Court's decision to issue challenged jury instructions.[50]  We "will review a refusal to give a 'particular' instruction (that is, an instruction is given but not with the exact form, content or language requested) for an abuse of discretion."[51]  This Court will generally decline to review contentions neither raised nor fairly presented to the trial court for decision.[52]  Accordingly, the

---

[48] Appellant's Opening Br. at 12–24.

[49] State's Answering Br. at 27–40.

[50] *North v. Owens-Corning Fiberglas Corp.,* 704 A.2d 835, 837 (Del. 1997).

[51] *Hankins v. State*, 976 A.2d 839, 840 (Del. 2009).

[52] *Probst v. State,* 547 A.2d 114, 119 (Del. 1988).

14

failure to object at trial usually constitutes a forfeiture of a defendant's right to raise the issue on appeal unless the error is plain.[53] Under the plain error standard, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process.[54]

In reviewing a jury instruction, this Court first must determine "whether the Superior Court's jury instructions were erroneous[] as a matter of law."[55] The Court will not reverse the trial court's jury instruction "if it is 'reasonably informative and not misleading, judged by common practices and standards of verbal communication.'"[56] The Court will reverse, however, "if the alleged deficiency in the jury instructions 'undermined . . . the jury's ability to intelligently perform its duty in returning a verdict.'"[57] Our analysis focuses "not on whether any special words were used, but whether the instruction correctly stated the law and enabled the jury to perform its duty."[58] The instructions need not be perfect, and a party does

---

[53] *Id.*

[54] *Id.*; *Wainwright v. State,* 504 A.2d 1096, 1100 (Del. 1986), *cert. denied*, 479 U.S. 869, 107 (1986).

[55] *Chance v. State*, 685 A.2d 351, 354 (Del. 1996).

[56] *Phillips v. State*, 154 A.3d 1146, 1160 (Del. 2017).

[57] *Id.*

[58] *Corbitt v. Tatagari*, 804 A.2d 1057, 1062 (Del. 2002).

not have a right to a particular instruction in a particular form.[59] In evaluating the propriety of a jury charge, the instructions must be viewed as a whole.[60]

Most of the errors that Ford identifies in the jury instructions are occasions in which—according to the trial transcript—the trial judge's oral instructions departed from the written instructions in some way. Ford did not raise any objection to the oral instructions during trial and we therefore review for plain error.

First, Ford points to an occasion in the transcript that described the requisite state of mind as "objective" rather than "subjective."[61] The Superior Court may have incorrectly read the instruction and stated that "it is the Defendant's *objective* state of mind that is at issue, not that of a hypothetical reasonable person."[62] Assuming that this misstatement actually occurred and was not a transcription error, the mistake was harmless.[63] The state of mind required was correct in the written instructions given to the jury during its deliberations.[64] Moreover, during the same

---

[59] *Haas v. United Technologies Corp.*, 450 A.2d 1173, 1179 (Del. 1982); *Chavin v. Cope,* 243 A.2d 694 (Del. 1968).

[60] *Culver v. Bennett*, 588 A.2d 1094, 1096 (Del. 1991).

[61] Appellant's Opening Br. at 27–28.

[62] B311.

[63] *See Van Arsdall v. State*, 524 A.2d 3, 10 (Del. 1987).

[64] *See* Super. Dkt. 46 at 14 (Charge to the Jury); *see also Sirmans v. Penn*, 588 A.2d 1103, 1105 (Del. 1991) (holding that a verbal mistake in the jury instruction was cured when the judge instructed the jury to rely on the written instruction that was correct); *People v. Mungia,* 44 Cal.4th 1101, 1132 (Cal. 2008) ("[W]hen erroneous oral instructions are supplemented by correct written ones, we assume the jury followed the written instructions").

16

set of instructions, the judge defined "conscious" as what a person "subjectively knew or felt," and stated that "reckless causation" is not established unless the "Defendant is aware" of the risk that produced the actual result.[65]

Similarly, Ford argues that the trial court plainly erred by instructing the jury that second-degree murder involves a "*fine if* the defendant recklessly caused the death . . . ."[66] Again, assuming that this was not a transcription error, the court plainly misspoke and intended to say "finding that." The written instructions were correct and any error in the reading was harmless.[67]

Ford asserts that these errors were "topped off" by the court's instruction that the State was required to prove that the defendant had a "recklessness criminal negligence state of mind, knowledge or belief required for a finding of guilt."[68] Again, the written instruction is clearer than the transcript. Importantly, the written instruction used commas: "recklessness, criminal negligence state of mind, knowledge or belief."[69] Ford's counsel proposed a similar state-of-mind instruction, but rather than using a comma the proposed instruction asked the jury to consider

---

[65] Super. Dkt. 46 at 14.

[66] Appellant's Opening Br. at 30; A122.

[67] Super. Dkt. 46 at 20; *see Corbitt*, 804 A.2d 1062 (Del. 2002) (the focus is on whether the instruction "enabled the jury to perform its duty").

[68] Appellant's Opening Br. at 31; *see also* A124; B322.

[69] Super. Dkt. 46 at 21 ("recklessness, criminal negligence state of mind, knowledge or belief" appears in the court's "State of Mind" instruction).

whether the defendant had "the required reckless *or* criminally negligent state of mind."[70] The difference between using a comma and using "or" was not an abuse of discretion or plain error, especially because the instructions separately defined both "recklessness" and "criminal negligence," and identified which *mens rea* was associated with each charged offense.[71]

Ford also argues that the written instructions contained errors, the first of which he objected to at trial.[72] Ford first contends that the definition of "reckless" provided to the jury incorrectly stated that the defendant must have been "aware of and consciously disregarded . . . an unjustifiable risk . . . that death results or *would* result from the conduct."[73] Ford argues that the use of "would"—rather than the statutory term "will"—in this instruction incorrectly suggested to the jury that it could find that Ford was reckless if his conduct could possibly cause a substantial risk of death, rather than finding that the conduct was certain to do so.[74] But Ford

---

[70] Super. Dkt. 45 (Ford's Proposed Instruction) (emphasis added).

[71] Super. Dkt. 46 at 7–8, 10, 12–14, 20.

[72] During trial, Ford's counsel provided the Superior Court with a list of instructions that he sought to include in the jury instructions. *See* Super. Dkt. 45. Ford's counsel stated that "[a]ll pattern instructions, not included herein, are appropriate." *See id.* The proposed instructions deviated from the Superior Court Criminal Pattern Instructions only in subtle ways, and only in the definition of "Recklessly" and the instructions for "Cruel, Wicked and Depraved," "Vehicular Homicide in the First Degree," "Distinction Between Reckless and Criminal Negligence," and "State of Mind." *Compare id.*, *with* Super. Ct. Pattern Crim. Jury Instr. Murder in the Second Degree [Reckless Indifference], Vehicular Homicide in the First Degree, 2.5 (State of Mind), 4.29 (Reckless or Negligent Causation).

[73] Super. Dkt. 46 at 11.

[74] Appellant's Reply Br. at 10–11.

18

admits "would" is the past tense of "will." Because the court was defining recklessness in the past tense, it used "would" appropriately.[75] The instruction correctly focused the jury on Ford's *mens rea* at the time of the car crash.

Ford did not object to any other part of the instructions during trial, so we review his remaining arguments for plain error except to the extent that the final instructions deviated from Ford's proposed instructions, which we will review for an abuse of discretion.[76] Ford contends that the definition of "depraved" in the "depraved indifference" instruction was error. In the Superior Court, Ford sought to define "depraved" as "a mind that has ceased to care for human life." The Superior Court used its pattern instruction for the definition of "depraved indifference," which defines "depraved" as "an indifference for human life." Ford's requested definition and the Superior Court's instruction are at least very similar. Words not expressly defined by the criminal code are understood in accordance with their commonly

---

[75] Ford also identifies two other places in the instruction where he believes the trial court should have used "will" instead of "would." We continue to find no error because "would" is the past tense of "will," as Ford admits. Appellant's Opening Br. at 32 ("By definition, 'would' is the past tense of 'will' . . . ."); *see Ramirez v. State*, 174 N.E.3d 181, 198 (Ind. 2021) (use of "could" instead of "would" in the jury instruction was not reversible error); *Briggs v. State*, 226 So.3d 59, 61 (Miss. 2017) (use of the word "would" and not "will" in the jury instruction was not reversible error).

[76] *Hankins*, 976 A.2d at 840 (citing *Wright,* 953 A.2d at 148).

accepted meaning.[77] Black's Law Dictionary states that a "depraved mind" is one that is "indifferent to human life."[78]

Last, Ford argues that the court's instruction that "every person is inferred to intend the natural and probable consequences of his acts" confused the jury.[79] Ford does not argue that the instruction contravened our decision in *Plass v. State*[80] regarding "presumed" intent, nor does he cite the United States Supreme Court's decisions in *Sandstrom v. Montana*[81] or *Francis v. Franklin*[82] regarding mandatory presumptions. Ford argues only that the court's inference instruction created "confusion" that he was "presumed as a matter of law" to intend "the probable

---

[77] 11 *Del. C.* § 221(c) ("If a word used in this Criminal Code is not defined herein, it has its commonly accepted meaning, and may be defined as appropriate to fulfill the purposes of the provision as declared in s 201 of this title."); *Waters*, 443 A.2d at 506 ("We hold, therefore, that it was plain and reversible error not to charge the jury as to the commonly accepted meaning of the brief language of § 635(1) under which this defendant was convicted.").

[78] *Black's Law Dictionary* 396–97 (5th ed. 1978) (definition of "depraved"); *see also Rogers v. State*, 41 A.3d 430 (Del. 2012) ("In its initial instruction, the Superior Court explained the meaning of 'cruel,' 'depraved' and 'wicked' in plain terms.").

[79] B322.

[80] 457 A.2d 362, 365 (Del. 1983) (reversing an instruction that stated: "[a] person is *presumed* to intend the natural and probable consequences of his act."). Here, the instruction stated: "every person is *inferred* to intend the natural and probable consequences of his acts." B322.

[81] 442 U.S. 510, 515 (1979), *modified by Boyde v. California*, 494 U.S. 370 (1990).

[82] 471 U.S. 307, 329–30 (1985), *modified by Boyde,* 494 U.S. 370.

consequences of his act."[83] To the extent that Ford's argument on appeal can be viewed as raising the issue of mandatory rebuttable presumptions addressed in *Plass*, *Sandstrom*, and *Francis*, the Superior Court gave Ford's jury a specific reasonable doubt instruction within the "State of Mind" section (along with a separate, general reasonable doubt instruction) that relieved any arguable error arising from the "is inferred" phrase. The court instructed the jury that the "[f]act that our law permits you to draw an inference about a Defendant's state of mind in no way relieves the State of its burden of proving beyond a reasonable doubt every element of the case."[84] Because this Court has held that "infer" is different than "presume,"[85] and because of the specific reasonable doubt instruction here—given within the State of Mind instruction—we find no plain error.

---

[83] Ford asserts that the court ". . . commented, implicitly, on the conscious disregard on the part of the Defendant by indicating that not only is he reckless, but he is presumed as a matter of law, the probable consequences of his act even though the probable and natural consequences may, at the time of his conduct, be unconscious; viz., an instruction guaranteeing confusion in the mind of any and all jurors who heard and absorbed the meaning indicated in the instruction." Appellant's Opening Br. at 30.

[84] The Constitution requires the instruction "be tested by the way a reasonable juror could have interpreted the charge." *Tymes*, 2017 WL 915110 at *3 (citing *Sandstrom*, 442 U.S. at 514; *Hall*, 473 A.2d at 355) (emphasis added).

[85] *See Sellman v. State*, 805 A.2d 903 (Del. 2002); *see also Bray v. United States*, 306 F.2d 743, 747 (D.C. Cir. 1962) (explaining the differences between presumptions and inferences).

**D.** **The DART bus video's probative value was not substantially outweighed by the danger of unfair prejudice.**

Ford's final two claims on appeal relate to the video of the collision captured by the DART bus. He contends that the portion of the video that showed Milton's car in flames created unfair prejudice under Rule 403.[86] He also avers that the Superior Court erred when it did not view the video before showing it to the jury and when it allowed the video to be marked as a State exhibit, which made it available to the jury during deliberations.[87] The State responds that the video was admissible in its entirety because it accurately portrayed the scene and corroborated much of the eyewitnesses' testimony.[88] The State also asserts that the Superior Court was not required to view the video before allowing it to be played to the jury at trial and that the video was properly admitted as a State exhibit.[89]

The record is unclear as to whether the trial judge viewed the video before he ruled on its admissibility.[90] The State argues—without citation—that the Superior Court was not required to preview the video and that defense counsel did not raise a

---

[86] Appellant's Opening Br. at 35–37.

[87] *Id.* at 38–40.

[88] State's Answering Br. at 43, 47.

[89] *Id.*

[90] Defense counsel asked the court to view the video, but the sidebar then ends and the video was not played in the courtroom before it was shown to the jury. The relevant portion of the transcript reads: "[Defense Counsel]: I am asking to inspect it before this goes in; the Court inspect it. COURT: Where are we now? [The State]: Halfway up, if we finish through the video I don't anticipate having much to ask her. (End of sidebar conference)." Trial Tr. at 107 (Oct. 3, 2022).

Rule 403 objection at trial.[91]  Although Ford's counsel did not specifically cite Rule 403 at trial, he argued that the video was "not material" and "unduly prejudicial" because Milton's cause of death was blunt force trauma and "[s]howing the flames reaching up 20 feet into the air is simply unduly prejudicial, and incites emotions."[92] The trial court then elicited a proffer from the prosecutor, who represented that the video accurately depicted the scene from the bus driver's point of view and would be used by the reconstruction expert to show "gouge marks."[93]

The State's unsupported contention that the Superior Court is not required to preview a challenged video before showing it to the jury is unconvincing.  Some jurisdictions characterize a failure to preview a challenged video as a *per se* abuse of discretion because it deprives the trial court of the ability to validly perform the necessary balancing test.[94]  Other jurisdictions eschew a *per se* rule but deem it "best practices" or a "general rule" for a judge to review a challenged video before

---

[91] State's Answering Br. at 43 (" . . . a court does not have to preview *in camera* a proffered video when cross examination is available to the defense").

[92] Trial Tr. at 107 (Oct. 3, 2022).

[93] *Id.*

[94] *See United States v. Curtin,* 489 F.3d 935, 958 (9th Cir. 2007) ("[W]e hold as a matter of law that a court does not properly exercise its balancing discretion under Rule 403 when it fails to place on the scales and personally examine and evaluate *all* that it must weigh. Relying only on the descriptions of adversary counsel is insufficient to ensure that a defendant receives due process and fair trial to which he is entitled under our Constitution."); *People v. Diaz*, 227 Cal. App. 4th 362, 379 ("The nature of discretion requires that the court's decision be an informed one and not 'a shot in the dark.'"); *see also United States v. Heatherly*, 985 F.3d 254, 267 (3d Cir. 2021); *U.S. v. Finley*, 726 F.3d 483 (3d Cir. 2013); *U.S. v. Cunningham*, 694 F.3d 372 (3d Cir. 2012); *United States v. Loughry*, 660 F.3d 965, 971 (7th Cir. 2011).

admitting it.[95]  We have found no caselaw that supports the State's sweeping contention that a judge is never required to view a video challenged under Rule 403 before playing it to the jury.

The trial judge arguably abused his discretion to the extent that he failed to watch the two-minute video before ruling on Ford's objection.  Accepting a good-faith proffer from the State is to some degree understandable during a fast-moving trial, but a review of the short video would have called the proffer here into question.  First, the "gouge marks" were exhibited in a separate photograph, so there was no need to show the video for that purpose.[96]  Second, the "gouge marks" were barely visible—if at all—on the video.[97]

But "[i]t is not every error that will justify reversal, and it is not every mistake that may be made in the hurry of a trial that will warrant the setting aside of the judgment of that tribunal.  Instead, retrial is required when an error at trial is 'injurious' to the accused."[98]  "[T]his Court has consistently refused to reverse

---

[95] *See*, *e.g.*, *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 546 (Tex. 2018) ("We hold that, as a general rule, a trial court should view video evidence before ruling on admissibility when the contents of the video are at issue."); *State v. D.W.*, 318 Kan. 575, 580 (Kan. 2024) ("[W]e also disagree with D.W. that a district court *per se* abuses its discretion when it admits a gruesome video before personally reviewing its contents.").

[96] State's Trial Ex. 34, 35 (pictures of the gouge marks).

[97] B339 (DART bus video).

[98] *Van Arsdall*, 524 A.2d at 10 (citing *Fisher v. State*, 41 A. 184 (Del. 1898)).

convictions for errors found to be harmless."[99]  Any error in failing to preview the DART video was harmless because the court almost certainly would have admitted it in any event.  In fact, after the video was played during trial, the court expressly addressed Rule 403 and reaffirmed its ruling that the video's probative value was not substantially outweighed by its prejudicial effect.[100]

Similarly, the trial court did not abuse its discretion in overruling Ford's Rule 403 objection and admitting the entire video as an exhibit.  Although the video was in some sense duplicative of eyewitness testimony, it allowed the jury to visualize the events as they occurred in real time.  And although seeing the resulting collision and fire could have heightened the jury's emotions, it also allowed the jury to understand how busy the intersection was immediately before and after the crash.[101]

Considered in context, the video's probative value was not outweighed by the possible prejudice caused by its admission.  The video realistically depicted the events, and it was not a particularly gruesome scene; the viewer could not see what was happening inside Milton's vehicle after the crash.  The film only showed flames from the car and the explosion, which was consistent with witness testimony.

---

[99] *Id.*

[100] B239–40 ([The court]: "But it is my view that they are admissible pieces of evidence. And their probative value outweighs the prejudicial effect that they may have on a jury.  So I am going to admit them as pieces of evidence, and they will go back with the Jury.").

[101] *See* B339 (DART bus video at 1:30–1:59).

In addition, Ford mistakenly relies on *Flonnory v. State*[102] to argue that the video should not have been available to the jury during deliberation. This Court in *Flonnory* addressed whether Section 3507[103] testimony—a witness's prior out-of-court statements—should be provided to the jury during deliberations.[104] We cautioned in *Flonnory* that just as copies of trial transcripts can cause a jury to place undue emphasis on a portion of the testimony, transcripts or recordings of Section 3507 statements generally should not be admitted as a separate trial exhibit.[105] *Flonnory* is not applicable to the video here, which did not involve witness statements or trial testimony.

Ford also argues that the Superior Court abused its discretion when it allowed the DART bus driver, Annet Grier, to repeatedly comment that Ford and Fischer's cars were moving "fast." Ford's counsel objected several times at trial, but did not cite Rule 403 or otherwise explain to the trial court why Grier's comments were improper. On appeal, Ford again cites no law but only contends that Grier's comments were "repetitious and prejudicial."[106] But Grier's testimony was an

---

[102] 893 A.2d 507, 525 (Del. 2006) ("The trial judge has broad discretion to allow a jury to rehear testimony in any form.") (citing *Harrigan v. State*, 1997 WL 45084, 692 A.2d 412 (Del. 1997) (TABLE) (internal citations omitted)).

[103] 11 *Del. C*. § 3507.

[104] *Flonnory*, 893 A.2d at 525.

[105] *Id.*

[106] Opening Br. at 36.

expression of her direct impression of the scene, and Ford conceded during closing argument that he was driving "too d\*\*n fast," so we cannot discern any prejudice resulting from Grier's testimony.[107]

## IV.  CONCLUSION

For the foregoing reasons, we AFFIRM the Superior Court's decision and Ford's second-degree murder conviction.

---

[107] Trial Tr. at 24 (Oct. 11, 2022) ([Defense counsel]: "So if you take that word which is legitimated by being in the instructions, that means Tyler is driving along, and he is going fast.  And whether he knows how fast he is going or not, we you, not me, we you will, in all probability, look at that video and say too d\*\*n fast.  I don't know if it is 91, or 81, or 71, whatever it is it is fast."); *see also id.* at 49 ([Defense counsel]: "But I am saying you, independently have the ability to say he's going fast, but I'm not going to say 91 was the amount. It could have been 85. It is still fast.  It is still against the Law.  But at least you then think, well, maybe it's not as bad as it looks because of that.").